## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

PEGGY FONTENOT,          )
                                     )
        Plaintiff,        )
                                     )
v.                           )         Case No. CIV-16-1339-G
                                     )
MIKE HUNTER, in his official    )
capacity as Attorney General    )
of Oklahoma,             )
                                     )
        Defendant.     )

## ORDER

Now before the Court is Plaintiff Peggy Fontenot's Motion for Summary Judgment (Doc. No. 32) and Defendant Mike Hunter's Motion for Summary Judgment (Doc. No. 35), filed in his official capacity as Attorney General of Oklahoma (referred to herein as "the State"). The parties have responded and replied, each seeking relief in his or her favor under Federal Rule of Civil Procedure 56 on the constitutionality of Oklahoma's American Indian Arts and Crafts Sales Act of 1974 (codified as amended at Okla. Stat. tit. 78, §§ 71-75) (the "State Act").[1]

---

[1] On January 3, 2017, the parties stipulated as follows:

> In the interest of judicial economy and avoiding the need for preliminary litigation before a final judgment on the merits, Plaintiff has requested and Defendant has agreed that Defendant, his agents, representatives, and employees, will not enforce Okla. Stat. tit. 78, §§ 71-75 against Plaintiff. Defendant further agrees not to enforce Okla. Stat. tit. 78, §§ 71-75 on any other person that may

The State Act regulates a maker's or merchant's marketing of arts and crafts as "American Indian" in origin and prohibits the sale of improperly designated works. In 2016, the State Act was amended to exclude from its definition of "American Indian" all persons but citizens or enrolled members of a federally recognized tribe. Plaintiff—who is a member of the Patawomeck Indian Tribe of Virginia, a tribe recognized by the State of Virginia but not by the United States—brings this action "to vindicate . . . [her] constitutional rights to truthfully market her art in Oklahoma, participate in the interstate market for American Indian art and crafts, and enjoy her right to earn a living in a lawful occupation of her choice." Compl. (Doc. No. 1) ¶ 1. She has described those constitutional rights to include "[t]he right to truthfully describe and market one's art . . . protected by the First and Fourteenth Amendments," "the right to participate in the interstate market for American Indian art and crafts . . . protected by the Commerce Clause," and "the right to pursue a trade without being subjected to irrational, arbitrary, and discriminatory laws . . . guaranteed by the Due Process and Equal Protection Clauses of the Fourteenth Amendment." *Id.* ¶ 5.[2] Plaintiff further contends that the State Act "unconstitutionally

---

otherwise lawfully market their art as "American Indian-made" consistent with the federal Indian Arts and Crafts Act, 25 U.S.C. § 305e.

Stipulation to Stay Enforcement of Oklahoma Statute Title 78, §§ 71-75 (Doc. No. 16) at 2-3; *see* Order of Jan. 4, 2017 (Doc. No. 17).

[2] A plaintiff "may challenge the constitutionality of a statute by asserting a facial challenge, an as-applied challenge, or both." *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011). Here, Plaintiff contends that the State Act "is unconstitutional, facially and as applied." Compl. at 20, ¶¶ 1(a)-(e). Although "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional

frustrates the purpose of the [federal Indian Arts and Crafts Act of 1990, 25 U.S.C. §§ 305-

305f ("IACA")] in violation of the Supremacy Clause." *Id.* ¶ 74. Plaintiff seeks a

declaration that the State Act "is invalid, unenforceable, and void," as well as a permanent

injunction against further enforcement of that Act. *See id.* ¶ 7.

STANDARD OF REVIEW

Summary judgment is a means of testing in advance of trial whether the available

evidence would permit a reasonable jury to find in favor of the party asserting a claim. The

Court must grant summary judgment when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An

issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact

could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670

(10th Cir. 1998). "An issue of fact is 'material' if under the substantive law it is essential

to the proper disposition of the claim." *Id.*

A party that moves for summary judgment has the burden of showing that the

undisputed material facts require judgment as a matter of law in its favor. *Celotex Corp.

v. Catrett*, 477 U.S. 317, 322 (1986). If the movant carries this initial burden, the

---

challenge," *Citizens United v. FEC*, 558 U.S. 310, 331 (2010), "[t]he distinction is both
instructive and necessary, for it goes to the breadth of the remedy employed by the Court."
*Id.* The facial invalidation of a statute is a broader remedy than an as-applied invalidation.
A facial challenge is grounded on the argument that a particular law can never be validly
enforced and would be unconstitutional "in all, or virtually all, of its applications." *Carel*,
668 F.3d at 1217 (internal quotation marks omitted). "An as-applied challenge concedes
that the statute may be constitutional in many of its applications, but contends that it is not
so under the particular circumstances of the case." *Id.* (alteration, emphasis, and internal
quotation marks omitted).

nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671 (quoting prior version of Fed. R. Civ. P. 56(e)); *see also* LCvR 56.1(c). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Parties may establish the existence or nonexistence of a material disputed fact by:

- citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

- demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A)-(B). While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252.

The Tenth Circuit has explained that "'[t]he filing of cross-motions for summary judgment does not necessarily concede the absence of a material issue of fact. This must be so because by the filing of a motion a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the

event his adversary's theory is adopted.'" *Brown v. Perez*, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016) (quoting *Nafco Oil & Gas, Inc. v. Appleman*, 380 F.2d 323, 324-25 (10th Cir. 1967)). "Accordingly, '[c]ross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" *Id.* (alteration in original) (quoting *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007)). Thus, "'[e]ven where the parties file cross motions pursuant to Rule 56, summary judgment is inappropriate if disputes remain as to material facts.'" *Id.* (internal quotation marks omitted).

## THE CHALLENGED STATE LAW

### A. *Oklahoma's American Indian Arts and Crafts Sales Act of 1974*

"The purpose of the American Indian Arts and Crafts Sales Act of 1974 is to protect the public, under the police powers of the state, from false representation in the sale of authentic and imitation American Indian arts and crafts." Okla. Stat. tit. 78, § 72.[3] Prior to June 2016, the State Act defined the term "Indian" as

> a person who is enrolled or who is a lineal descendant of one enrolled upon an enrollment listing of the Bureau of Indian Affairs or upon the enrollment listing of a recognized Indian tribe, band or pueblo[.]

---

[3]Other states also have enacted laws that regulate the sale, and prohibit the misrepresentation, of American Indian arts and crafts. *See, e.g.*, Alaska Stat. §§ 45.65.010 et seq.; Ariz. Rev. Stat. Ann. §§ 44-1231 et seq.; Cal. Bus. & Prof. Code §§ 17569-17569.9; Colo. Rev. Stat. §§ 6-15-201 et seq.; Minn. Stat. Ann. §§ 325F.43 et seq.; Mo. Rev. Stat. § 407.315; Mont. Code Ann. §§ 30-14-601 et seq.; Neb. Rev. Stat. §§ 69-1801 et seq.; Nev. Rev. Stat. § 597.900; N.M. Stat. Ann. §§ 30-33-1 et seq.; S.D. Codified Laws §§ 37-7-1 et seq.; Tex. Bus. & Com. Code Ann. §§ 17.851 et seq.

*Id.* § 73(2) (1974). The State Act further defined the phrase "Indian tribe" to "mean[ ] any Indian tribe, organized band or pueblo, which is domiciled in the United States." *Id.* § 73(1) (1974).

B. *The 2016 Amendments*

On June 8, 2016, the State Act was duly amended. *See* H.B. 2261, 55th Leg., 2d Reg. Sess. (2016). The amendments, among other things, narrowed the definition of "Indian" to "American Indian" and to "mean[ ] a person who is a citizen or is an enrolled member of an American Indian tribe." Okla. Stat. tit. 78, § 73(2) (2016). The phrase "Indian tribe" was further limited to "American Indian Tribe" and to "mean[ ] any Indian tribe federally recognized by the Bureau of Indian Affairs of the United States Department of the Interior." *Id.* § 73(1) (2016). By this amendment, Oklahoma's statutory definition of "American Indian" excluded those persons who are not citizens or enrolled members of a federally recognized tribe.

The State Act, as amended, provides that "'[a]uthentic American Indian arts and crafts' means any article of American Indian style, make, origin or design which is made wholly or in part by American Indian labor and workmanship." *Id.* § 73(4) (2016).[4] The State Act further prescribes that "basic article[s] purporting to be of American Indian style,

_____

[4] The prior version read in relevant part: "'Authentic American Indian arts and crafts' means any article of Indian style, make, origin or design which is made wholly or in part by Indian labor and workmanship . . . ." Okla. Stat. tit. 78, § 73(4) (1974).

make, origin or design which [are] not made by American Indian labor and workmanship" are deemed "'[i]mitation American Indian arts and crafts.'" *Id.* § 73(3) (2016).[5]

The State Act makes it "unlawful to distribute, trade, sell or offer for sale or trade within th[e] [S]tate [of Oklahoma] any article represented as being made by American Indians unless the article actually is made or assembled by American Indian labor or workmanship." *Id.* § 74 (2016). "'Merchant[s],'" who "engage[ ] in the sale to the public of imitation American Indian arts and crafts," *id.* § 73(5) (2016), and

> who knowingly and willfully tag[ ] or label[ ] any article as being an American Indian art or craft when it does not meet the specifications of the . . . Act . . . shall be guilty of violating the . . . Act and shall be punished by a fine of not less than Twenty-five Dollars ($25.00) nor more than Two Hundred Dollars ($200.00), or by imprisonment for not less than thirty (30) days nor more than ninety (90) days, or by both such fine and imprisonment.

*Id.* § 75 (2016).[6]

---

[5] Section 73(3) originally read: "'Imitation American Indian arts and crafts' means any basic article purporting to be of Indian style, make, origin or design which is not made by Indian labor and workmanship." Okla. Stat. tit. 78, § 73(3) (1974).

[6] In regulating the sale of American Indian works, states have adopted differing definitions of the terms "American Indian" or "Indian." *See* Ariz. Rev. Stat. Ann. § 44-1231(3) ("'Indian' means a person who is enrolled or who is a lineal descendant of one enrolled upon an enrollment listing of the bureau of Indian affairs, or upon the enrollment listing of a recognized Indian tribe domiciled within the United States border."); Cal. Bus. & Prof. Code 17569.9 ("'Indian,' as used in this article, means a person who is enrolled or who is a lineal descendant of one enrolled upon an enrollment listing of the Bureau of Indian Affairs, or upon the enrollment listing of a recognized Indian tribe, band or pueblo."); Colo. Rev. Stat. § 6-15-203(6) ("'Indian' means any person who is enrolled or is a lineal descendent of one enrolled upon an enrollment listing of the bureau of Indian affairs or upon the enrollment listing of a recognized Indian tribe domiciled in the United States or a person recognized by any Indian tribe as being Indian."); Minn. Stat. Ann. § 325F.43 ("Indian-made goods are those made exclusively by persons who are of at least one-quarter Indian blood or who are listed on the rolls of the United States Bureau of Indian Affairs as Indians."); Mo. Rev. Stat. § 407.315(1)(1) ("'American Indian', a person who is a citizen

Plaintiff is a United States citizen and a resident of the State of California. She has

been an artist and photographer for over 30 years and travels throughout the United States,

_____

or enrolled member of an American Indian tribe"); *id.* 407.315(1)(2) ("'American Indian tribe', any Indian tribe federally recognized by the Bureau of Indian Affairs of the United States Department of the Interior"); Mont. Code Ann. § 30-14-601(2) ("'Indian' means a person who is enrolled or who is a lineal descendant of one enrolled upon an enrollment listing of the bureau of Indian affairs or upon the enrollment listing of a recognized Indian tribe, domiciled in the United States."); Neb. Rev. Stat. § 69-1803(1) ("American Indian shall mean any person of at least one-quarter American Indian blood who is enrolled or is a lineal descendant of an American Indian enrolled upon enrollment listing of the federal Bureau of Indian Affairs"); Nev. Rev. Stat. § 597.900(1)(b) ("'Indian' means a person who is enrolled or who is a lineal descendant of one enrolled upon an enrollment listing of the Bureau of Indian Affairs, or upon the enrollment listing of a recognized Indian tribe, domiciled in the United States."); N.M. Stat. Ann. § 30-33-4(A)(1)-(2) ("'Indian tribe' means: (1) any tribe, band, nation, Alaska native village or other organized group or community that is eligible for the special programs and services provided by the United States government to Indians because of their status as Indians; or (2) any tribe that has been formally recognized as an Indian tribe by a state legislature"); *id.* § 30-33-4(B)(1)-(2) ("'Indian' means: (1) any person who is an enrolled member of an Indian tribe as evidenced by a tribal enrollment card or certified tribal records; or (2) any person who can meet the minimum qualifications for services offered by the United States government to Indians because of their special status as Indians as evidenced by a certificate of degree of Indian blood card"); S.D. Codified Laws § 37-7-4(1) ("'Indian,' any person who is enrolled or who is a lineal descendant of one enrolled upon the enrollment listing of a recognized Indian tribe domiciled within the United States"); Tex. Bus. & Com. Code Ann. § 17.851(1) ("'American Indian' or 'Indian' means an individual who is an enrolled member of a federally or state recognized American Indian tribe, band, nation, rancheria, or pueblo or who is an Alaska Native and a member of an Alaska Native village or regional or village corporation as defined in or established under the Alaska Native Claims Settlement Act (43 U.S.C. Sec. 1601 et seq.)"); *see also* Alaska Stat. § 45.65.070(1) ("'Alaska Native person' means an individual who is a state resident and who is an enrolled member of an Alaska tribe"); *id.* § 45.65.070(2) ("'Alaska tribe' means an organized group or community in Alaska that is an Indian tribe; . . . 'Indian tribe' has the meaning given in 25 U.S.C. § 450b(e)").

[7] All material facts relied upon in this Order are uncontroverted or, where genuinely disputed, identified as such and viewed in the light most favorable to the respective nonmovant. *See generally* Pl.'s Index of Evid. Ex. 1 (Decl. of Peggy Fontenot) (Oct. 11,

including the last 10 to 13 years to Oklahoma, to show and sell her art in American Indian art shows, festivals, and galleries. Plaintiff's specialties are handmade beaded jewelry, silver jewelry, and black and white photography.

Plaintiff has shown and sold her art in museums and galleries throughout the United States, including the Smithsonian National Museum of the American Indian ("Smithsonian") in Washington, D.C., and the Autry Museum of the American West in Los Angeles, California. Plaintiff has taught American Indian beadwork classes, including classes at the Smithsonian and the Southwest Museum in Los Angeles.

Plaintiff has won numerous awards. She placed first in Photography and Beadwork in 2015, 2016, and 2017 at the Eiteljorg Museum Indian Market Place in Indianapolis, Indiana, first in Photography in 2015 and third in Beadwork in 2016 at the Red Earth Pow Wow in Oklahoma City, Oklahoma, and second in Photography in 2016 at the Autry Museum of the American Indian Market Place in Los Angeles.

Plaintiff first identified herself as an American Indian, with respect to her work, in the 1980s. *See* Def.'s Mot. Ex. 4 (Dep. of Peggy Fontenot) (June 17, 2017) (Doc. No. 35-4) at p. 22, l. 7 (hereinafter, "Pl.'s Dep.").[8] She first marketed her work in Oklahoma as "American Indian-made" in 2004. *See id*. at p. 22, ll. 16-18. Her business cards note her

_____

2017) (Doc. No. 34-1); Def.'s Mot. Ex. 4 (Dep. of Peggy Fontenot) (June 12, 2017) (Doc. No. 35-4); Pl.'s Suppl. Index of Evid. Ex. 19 (Suppl. Decl. of Peggy Fontenot) (Nov. 6, 2017) (Doc. No. 40-1); Pl.'s Suppl. Index of Evid. Ex. 24 (Dep. of Peggy Fontenot) (June 12, 2017) (Doc. No. 40-6).

[8] Citations to documents electronically filed in this Court use the CM/ECF pagination.

tribal affiliation, *see* Pl.'s Index of Evid. Ex. 5 (Doc. No. 34-5), and she displays a sign at art shows and festivals noting her affiliation. At these events, Plaintiff is sometimes asked about her tribal affiliations, and she describes her art in conjunction with her "American Indian identity." *See* Pl.'s Index of Evid. Ex. 1 (Decl. of Peggy Fontenot) (Oct. 11, 2017) (Doc. No. 34-1) ¶ 5. She considers her "American Indian identity" to be "central to [her] art." *Id.*

Prior to 2000, Plaintiff marketed herself "as a Cherokee artist" even though she is not a member of the Cherokee Nation and the Cherokee Nation had not certified her as a tribal artisan. Def.'s Mot. Ex. 4 (Pl.'s Dep.) (Doc. No. 35-4) at p. 7, l. 5; *id.* at p. 7, l. 16. After 2000, Plaintiff changed statements on her event signs and business cards from "Cherokee artist" to "Cherokee descent," since she is "not certified by that tribe, and Cherokee artist implied that [she] was." *Id.* at p. 7, ll. 16-17, 23 to p. 8, l. 1; Pl.'s Summ. J. Resp. (Doc. No. 39) at 8.

In 2006, Plaintiff became a tribal member of the Patawomeck Indian Tribe of Virginia ("Patawomeck Tribe").[9] Def.'s Mot. Ex. 7 (Doc. No. 35-7) at 1-3. This tribe is recognized by the Commonwealth of Virginia but not by the United States. *See* Pl.'s Index of Evid. Ex. 14 (H.R.J. Res. 150, 2010 Sess. (Va. 2010)) (Doc. No. 34-14). The

---

[9] Plaintiff has claimed that, in 2004, she was certified by the Citizen Potawatomi Nation as an "Indian Artisan who has Citizen Band Potawatomi heritage." Pl.'s Index of Evid. Ex. 3 (Doc. No. 34-3). She has admitted, however, that she cannot become a member of the Citizen Potawatomi Nation "because of their enrollment requirements." Def.'s Mot. Ex. 4 (Pl.'s Dep.) (Doc. No. 35-4) at p. 10, ll. 16-17. In challenging the State Act, Plaintiff has not relied on this lineage; she has instead relied on the fact that she is a member of the Patawomeck Tribe. *See* Pl.'s Reply (Doc. No. 43) at 2, ¶ 3.

Patawomeck Tribe is a "Descendancy Based Tribe": "to qualify for Full Tribal Membership . . . [an] [a]pplicant must show his or her descendancy from an existing Tribal member or provide . . . a detailed genealogy, along with documentation showing descent from a Patawomeck Indian." Def.'s Mot. Ex. 7 (Doc. No. 35-7) at 4.

As of 2017, Plaintiff's advertising describes her artwork as "Native American." Her event signs and business cards contain contact information as well as a list that reads, in order, "Patawomeck," "Potawatomi," and "Cherokee Descent." *See* Pl.'s Index of Evid. Ex. 5 (Doc. No. 34-5) at 1-2.

ANALYSIS

## A. Standing

The State has first argued that Plaintiff lacks standing to pursue this matter because Plaintiff cannot demonstrate the essential requirements of Article III standing. As the Supreme Court has recognized, "[s]tanding to sue is a doctrine rooted in the traditional understanding of a case or controversy.[10] The doctrine . . . ensure[s] that federal courts do not exceed their authority as it has been traditionally understood" by "limit[ing] the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted). Only those litigants that have established that they "have (1) suffered an injury in fact, (2)

---

[10] As the Supreme Court has explained, "'[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)); U.S. Const., art. III, § 2.

that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," have standing to sue. *Id*. (citations omitted).

"The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id*. (citation omitted). Because standing is "an indispensable part of the plaintiff's case," "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citations omitted). Thus, to defeat the State's motion for summary judgment, Plaintiff must show with Rule 56(c) evidentiary material that each of the standing elements is, at minimum, the subject of a genuine dispute of material fact— "mere allegations of injury, causation, and redressability are insufficient." *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1280 (10th Cir. 2002) (internal quotation marks omitted). To establish her standing as a matter of law, Plaintiff must show with Rule 56 evidentiary material that the undisputed material facts establish each standing element. *See Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).

"Injury in fact," which is the subject of the State's challenge, is "the 'first and foremost' of standing's three elements." *Spokeo*, 136 S. Ct. at 1547 (alteration and internal quotation marks omitted). "[T]he injury-in-fact requirement . . . helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent,

not conjectural or hypothetical.'" *Id*. at 1548 (quoting *Lujan*, 504 U.S. at 560). "[T]o be 'particularized,'" an injury "'must affect the plaintiff in a personal and individual way.'" *Id*. (quoting *Lujan*, 504 U.S. at 560 n.1). To be "concrete," an injury must "actually exist." *Id*.; *see id*. at 1549 ("Article III standing requires a concrete injury even in the context of a statutory violation."). To be "actual or imminent," the alleged "injury . . . must be more than a possibility." *Essence, Inc.,* 285 F.3d at 1282. "Allegations of possible future injury do not satisfy the ['actual or imminent'] requirement[ ] of Art. III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). Rather, a plaintiff must establish that "[t]he 'threat of injury [is] both real and immediate.'" *Essence, Inc.*, 285 F.3d at 1282 (internal quotation marks omitted); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.").

The material facts relevant to this analysis are undisputed. Plaintiff has asserted, and the State has admitted, that notwithstanding Plaintiff's status as a member of a state recognized tribe the State Act "prohibits Plaintiff from marketing for sale her art as American Indian-made because she is not a member of a federally recognized tribe." Pl.'s Index of Evid. Ex. 16 (Def.'s Suppl. Resp. to Pl.'s Req. Admis. No. 4) (Doc. No. 34-16) at 3. The State Act, as amended, therefore precludes Plaintiff's participation in the Oklahoma market for American Indian art and disadvantages her in the national market for American Indian art. Accordingly, Plaintiff has shown that this legislation places her in immediate danger of suffering a direct injury, thereby "affect[ing]" her "in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks omitted); *Lujan*, 504 U.S. at

561-62 (noting that when a plaintiff is "challenging the legality of government action" that regulates her directly, "there is ordinarily little question that the action . . . has caused h[er] injury, and that a judgment preventing . . . the action will redress it").  Plaintiff's standing to assert her claims is established as a matter of law.

## B.  Due Process

Plaintiff has sought relief under the Due Process Clause of the Fourteenth Amendment to the Constitution.  *See* U.S. Const. amend. XIV, § 1.[11]  Plaintiff has contended that—by "[r]eserving to members of federally recognized tribes the right to market and describe their art as American Indian-made," Compl. ¶ 76—the State Act "irrationally burden[s] . . . [her] right to earn a living," Pl.'s Mem. (Doc. No. 33) at 12, and "protect[s] artists who are members of federally recognized tribes from economic competition," Compl. ¶ 78.  Plaintiff has alleged that "no legitimate governmental interest [is] advanced by prohibiting artists who are members of state-recognized tribes, or who are lineal descendants of American Indians, from describing and marketing their art as American Indian-made."  *Id.* ¶ 79.

---

[11] The Fourteenth Amendment provides that no state "shall deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  To prevail on a substantive due process claim, as is asserted in this case, a plaintiff must first establish the existence of "a constitutionally cognizable liberty or property interest with which the state has interfered."  *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006).  The State has not questioned that Plaintiff has a constitutionally protected interest sufficient to support her due process claim.  *See Dent v. West Virginia*, 129 U.S. 114, 121 (1889) ("It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex, and condition.").

The State Act is an economic regulation that impacts Plaintiff's ability "to pursue her chosen occupation as an American Indian artist." *Id.* ¶ 76. As such, it "does not affect a fundamental right and categorizes people on the basis of a non-suspect classification." *Powers v. Harris*, 379 F.3d 1208, 1215 (10th Cir. 2004). The Court must therefore determine whether the State Act "passes constitutional muster . . . by applying rational-basis review." *Id.*

Consumer protection law is a field traditionally regulated by states. *See Watters v. Wachovia Bank*, 550 U.S. 1, 35-36 (2007) (Stevens, J., dissenting). "The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of . . . deception and fraud." *Dent*, 129 U.S. at 122. Thus, a state has "'wide latitude in enacting . . . economic legislation.'" *Allright Colo., Inc. v. City & Cty. of Denver*, 937 F.2d 1502, 1512 (10th Cir. 1991) (internal quotation marks omitted).

"'[T]he federal courts do not sit as arbiters of the wisdom or utility of these laws.'" *Id.* (internal quotation marks omitted). Accordingly, the Court's review of the State Act is limited to whether the State Act is "rationally related to a legitimate government purpose." *Powers*, 379 F.3d at 1215 (internal quotation marks omitted). The Court "need not satisfy [itself] that the challenged [statute] will in fact further [the State's] articulated purpose[]." *Allright Colo., Inc.*, 937 F.2d at 1512. "[I]t is sufficient if the legislature could rationally have concluded that th[is] purpose[ ] would be achieved." *Id.* (internal quotation marks omitted).

Plaintiff, as the "one complaining of a due process violation," must "establish that the legislature has acted in an arbitrary and irrational way." *KT & G Corp. v. Att'y Gen. of Okla.*, 535 F.3d 1114, 1142 (10th Cir. 2008) (internal quotation marks omitted). The Court finds Plaintiff "has failed to meet [her] heavy burden," *id.* at 1143, even viewed through the lens of summary judgment. The State of Oklahoma has a legitimate interest in "protect[ing] the public . . . from false representation in the sale of authentic and imitation American Indian art," and against false representations about a work's "style, make, origin or design." Okla. Stat. tit. 78, §§ 72, 73(3). And, notwithstanding Plaintiff's disagreement with the definition of American Indian reflected in the State Act, there is no reasonable dispute that the Oklahoma legislature could rationally have concluded that, to meet the purpose of the State Act, some definition must be drawn and the definition it adopted was a reasonable one. Accordingly, Plaintiff's due process claim fails.

## C. Equal Protection

"[T]he essence" of the Equal Protection Clause of the Fourteenth Amendment is that the state must "treat all those similarly situated similarly." *Powers,* 379 F.3d at 1215 (internal quotation marks omitted).[12] Plaintiff has alleged that the State Act violates this Fourteenth Amendment right by "creat[ing] an irrational and arbitrary distinction among American Indian artists." Compl. ¶ 83.

-----

[12] *See* U.S. Const. amend. XIV, § 1 (providing that no state shall "deny to any person within its jurisdiction the equal protection of the laws").

Because the State Act is an economic regulation that does not involve a fundamental right or suspect classification, it is again subject only to rational-basis review. *See Heller v. Doe ex rel. Doe*, 509 U.S. 312, 319-20 (1993). "[I]f there is a rational relationship between the disparity of treatment and some legitimate government purpose," the State Act "cannot run afoul of the Equal Protection Clause." *Id.* at 320. "[W]here ordinary commercial transactions are at issue, rational basis review requires deference to reasonable underlying legislative judgments." *Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012) (internal quotation marks omitted). Rational basis review "'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Heller*, 509 U.S. at 319 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).

Accordingly, the Court must uphold the classification at issue here "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 320 (internal quotation marks omitted). In other words, Plaintiff must "negative every conceivable basis which might support" the classification of artists reflected in the State Act "whether or not the basis has a foundation in the record." *Id.* at 320-21 (internal quotation marks omitted).[13] Plaintiff cannot prevail if "the question is at

_____

[13] *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981) ("States are not required to convince the courts of the correctness of their legislative judgments. Rather, 'those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.'" (quoting *Vance v. Bradley*, 440 U.S. 93, 111 (1979))).

least debatable." *Clover Leaf Creamery Co.*, 449 U.S. at 464 (internal quotation marks omitted).

The Court again concludes that a rational basis exists for the Oklahoma legislature's decision to distinguish between federal- and state-recognized tribes and to permit only citizens and enrolled members of federally recognized tribes to market and describe their work as "[a]uthentic American Indian arts and crafts." Okla. Stat. tit. 78, § 73(4) (2016). As the State has argued, that distinction "prevents consumers from being misled as to the status of the artist as 'American Indian,' given the rigorous process associated with federal tribal recognition and membership."[14] Def.'s Mot. (Doc. No. 35) at 30. Such protection constitutes a legitimate state interest, and the State Act is rationally related to that goal.[15]

The Supreme Court has explained that the "restraints on judicial review" reflected in the rational-basis standard "have added force 'where the legislature must necessarily engage in a process of line-drawing.'" *Beach Commc'ns*, 508 U.S. at 315 (quoting *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)). Here, defining "American Indian" for the purpose of a consumer-protection statute must "'inevitably require[] that some persons who have an almost equally strong claim to favored treatment be placed on different sides

---

[14] To the extent Plaintiff has challenged the basis for the State's argument, for purposes of rational-basis review, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315.

[15] "Classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them." *Clements v. Fashing*, 457 U.S. 957, 963 (1982).

of the line.'" *Fritz*, 449 U.S. at 179 (quoting *Mathews v. Diaz*, 426 U.S. 67, 83-84 (1976)); *see* Okla. Stat. tit. 78, § 73(2) (2016).  "[T]he fact the line might have been drawn differently . . . is a matter for legislative, rather than judicial, consideration."  *Fritz*, 449 U.S. at 179.

The Oklahoma legislature "had to draw the line somewhere."  *Beach Commc'ns*, 508 U.S. at 316.  It chose to exclude from Oklahoma's statutory definition of "American Indian" those persons who are not citizens or enrolled members of a federally recognized tribe.  Because there are plausible reasons for the State's actions, the Court concludes that the State Act, through rational means, furthers a legitimate legislative purpose of "protect[ing] the public . . . from false representation in the sale of authentic and imitation American Indian arts and crafts."  Okla. Stat. tit. 78, § 72.  Therefore, the Court finds that Plaintiff's equal protection claim fails.

### D.  *Dormant Commerce Clause*

The Commerce Clause of the United States Constitution grants Congress the "[p]ower . . . [t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  This "express grant . . . contains a further, negative command, known as the dormant Commerce Clause, that create[s] an area of trade free from interference by the States."  *Am. Trucking Ass'ns, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 433 (2005) (alteration in original) (citations and internal quotation marks omitted).  "This negative command prevents a State from jeopardizing the welfare of the Nation as a whole by placing burdens on the flow of commerce across its borders that commerce wholly within

those borders would not bear." *Id.* (alteration and internal quotation marks omitted).[16]  In

determining whether the State Act violates this "dormant" aspect of the Commerce Clause,

the Court must decide whether the State Act either: (1) unjustifiably discriminates against

interstate commerce, or (2) "impose[s] burdens on interstate trade that are 'clearly

excessive in relation to the putative local benefits.'"  *Id.* (quoting *Pike v. Bruce Church,*

*Inc.*, 397 U.S. 137, 142 (1970)).[17]

Plaintiff has claimed that the State Act both "discriminates against and excessively

burdens interstate commerce in American Indian art by favoring in-state American Indian

artists at the expense of out-of-state artists."  Pl.'s Mem. at 12.  Plaintiff has alleged that

prior to 2016 she "regularly traveled to and participated in American Indian art shows in

Oklahoma, marketing and describing her art as American Indian-made" but, since the Act's

---

[16] To the extent Congress has legislated in a particular field, the issue is more appropriately addressed in the context of preemption.  If Congress has not acted or if preemption has not been found, a plaintiff may challenge a state law as impeding interstate commerce.  *See S. Pac. Co. v. Ariz. ex rel. Sullivan*, 325 U.S. 761, 769 (1945).

[17] The Tenth Circuit has observed that "[a] state statute may violate the dormant Commerce Clause in three ways":

> First, a statute that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid *per se* and can survive only if the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.  Second, if the statute does not discriminate against interstate commerce, it will nevertheless be invalidated . . . if it imposes a burden on interstate commerce incommensurate with the local benefits secured.  Third, a statute will be invalid *per se* if it has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question.

*KT & G Corp.*, 535 F.3d at 1143 (internal quotation marks omitted).  Only the first two ways are implicated in this action.

amendment, she "has ceased marketing her art in Oklahoma" because "[t]he . . . Act prevents out-of-state artists like [Plaintiff], who are members of state-recognized tribes, from marketing their art and crafts in Oklahoma as American Indian-made."[18]  Compl. ¶¶ 58, 59.  Plaintiff has contended that the State Act "substantially burdens the American Indian art market for the purpose of benefitting artists who are members of Oklahoma-based federally recognized tribes" and "has the effect of discriminating against out-of-state artists in favor of in-state artists."  *Id.* ¶¶ 60, 61.  She has further alleged that the "substantial burdens on interstate commerce for Indian art . . . are not justified by any legitimate local interests or benefits" and that the State Act's "underlying purpose and effect" is to "protect[] in-state artists from competing with out-of-state artists."  *Id.* ¶¶ 62, 63.

A state law may be discriminatory: "on its face," *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007); or "in its direct effects," *Direct Mktg. Ass'n v. Brohl*, 814 F.3d 1129, 1142 (10th Cir. 2016) (citing *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1040 (10th Cir. 2009) (noting that a law "may be neutral in its terms and still discriminate against interstate commerce")).  "In this context, 'discrimination' simply means differential treatment of in-state and out-of-state economic

---

[18] Plaintiff has asserted that "[t]here are approximately 39 federally recognized tribes in Oklahoma.  Many other states recognize additional tribes at the state level.  On information and belief, approximately 18 states recognize a total of 62 state-recognized tribes."  Compl. ¶ 56.

interests that benefits the former and burdens the latter." *United Haulers Ass'n*, 550 U.S. at 338 (internal quotation marks omitted).[19]

Plaintiff has not shown that the State Act discriminates between in-state artists and out-of-state artists, either on its face or in its direct effects. The State Act prohibits artists who are not members of federally recognized tribes from marketing their art and crafts in Oklahoma as American Indian-made. That prohibition applies to both in-state and out-of-state artists.

Nor has Plaintiff shown that the State Act "benefits local [American Indian artists] and burdens out-of-state [American Indian artists]." *Direct Mktg. Ass'n*, 814 F.3d at 1142. "Whether a state law unduly burdens interstate commerce is a separate inquiry from whether a state law discriminates against interstate commerce." *Id*. at 1145. That is, "[a] state law that does not discriminate against interstate commerce may still be invalidated under the dormant Commerce Clause if it puts a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'" *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1309 (10th Cir. 2008) (quoting *Pike*, 397 U.S. at 142).

Plaintiff has claimed that the State Act's "substantial burdens on interstate commerce for Indian art . . . are not justified by any legitimate local interests or benefits." Compl. ¶ 62. In deciding whether any such burdens are clearly excessive in relation to the

_____

[19] The Commerce Clause and the Equal Protection Clause, which the Court has already addressed, "perform different functions in the analysis of the permissible scope of a State's power—one protects interstate commerce, and the other protects persons from unconstitutional discrimination by the States." *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 881 (1985) (footnote deleted).

putative local benefits, the Court must apply the four-factor balancing test articulated by the Supreme Court in *Pike*, which requires the Court to consider

> (1) the nature of the putative local benefits advanced by the [statute]; (2) the burden the [statute] imposes on interstate commerce; (3) whether the burden is "clearly excessive in relation to" the local benefits; and (4) whether the local interests can be promoted as well with a lesser impact on interstate commerce.

*Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs of Cty. of Rogers,* 27 F.3d 1499, 1512 (10th Cir. 1994) (footnotes omitted) (quoting *Pike*, 397 U.S. at 142).

The Court finds that, in this regard, Plaintiff has failed to make the showing necessary to survive Defendant's motion for summary judgment. Plaintiff has presented no evidentiary material under Rule 56(c) that raises a genuine issue of material fact as to whether the State Act burdens interstate commerce. The State Act does not prohibit an artist from offering his or her art and crafts for sale in Oklahoma; it restricts the manner of how these goods are marketed. As noted, this restriction applies to in-state and out-of-artists equally: those artists who are members of federally recognized tribes—whether they be in-state or out-of-state—may market and sell their art and crafts in Oklahoma as American Indian-made, and those artists who are members of only state-recognized tribes—again, whether they be in-state or out-of-state—may not market or sell their art and crafts in Oklahoma as American Indian-made. And Plaintiff has presented no evidentiary material under Rule 56(c) that raises a genuine issue of material fact that any such burden would be clearly excessive in relation to the local benefit of protecting the public from

improperly identified goods.[20]  *See* Okla. Stat. tit. 78, § 72 (stating purpose of the State Act

is the "protect[ion] [of] the public . . . from false representation in the sale of authentic and

imitation American Indian arts and crafts").  Absent any basis for concluding that the State

Act fails the *Pike* balancing test, the Court finds no merit to Plaintiff's claim that the State

Act unconstitutionally impacts interstate commerce.

E.  *First Amendment*

Plaintiff has alleged in her complaint that the State Act violates the First

Amendment to the United States Constitution by impermissibly restricting "the content of

her speech—i.e., whether or not she states she is an 'American Indian,' and whether or not

she represents that her art is American Indian-made."  Compl. ¶ 49.  Plaintiff also has

alleged that the State Act impermissibly infringes her speech because of her identity.  *See*

*id.* ¶ 50.

The First Amendment prohibits laws that "abridg[e] the freedom of speech."  U.S.

Const. amend. I.  The expression regulated by the State Act is that of an artist or distributor

"propos[ing] a commercial transaction."  *Va. State Bd. of Pharmacy v. Va. Citizens*

––––––––––––––––––––

[20] In *Kleinsmith*, the Tenth Circuit recited with approval the Seventh Circuit's observation in *Baude v. Heath*, 538 F.3d 608 (7th Cir. 2008):

"Any balancing approach, of which *Pike* is an example, requires evidence.  It is impossible to tell whether a burden on interstate commerce is clearly excessive in relation to the putative local benefits without understanding the magnitude of both burdens and benefits.  Exact figures are not essential (no more than estimates may be possible) and the evidence need not be in the record if it is subject to judicial notice, but it takes more than lawyers' talk to condemn a statute under *Pike*."

*Kleinsmith*, 571 F.3d at 1043-44 (quoting *Baude*, 538 F.3d at 612).

*Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (internal quotation marks omitted); *see* Okla. Stat. tit. 78, § 74 (2016) (regulating the "distribut[ion], trade, [sale] . . . or offer for sale or trade . . . [of] any article represented as being made by American Indians"). Thus, at issue here is commercial speech, to which "[t]he Constitution . . . accords . . . lesser protection" than to other speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980); *see Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 623 (1995) (explaining that restrictions on commercial speech subjected to "'intermediate' scrutiny"); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (noting that the First Amendment generally "does not prevent restrictions directed at commerce" "from imposing incidental burdens on speech").

In *Central Hudson*, the Supreme Court "established a three-part test governing First Amendment challenges to regulations restricting non-misleading commercial speech that relates to lawful activity." *Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228, 1237 (10th Cir. 2004).

> First, the government must assert a substantial interest to be achieved by the regulation. Second, the regulation must directly advance that governmental interest, meaning that it must do more than provide "only ineffective or remote support for the government's purpose." Third, although the regulation need not be the least restrictive measure available, it must be narrowly tailored not to restrict more speech than necessary. Together, these final two factors require that there be a reasonable fit between the government's objectives and the means it chooses to accomplish those ends.

*Id*. (citations omitted).

The State has shown that it had a substantial interest in "protect[ing] the public . . . from false representation in the sale of authentic and imitation American Indian arts and

crafts." Okla. Stat. tit. 78, § 72.  Further, as to the second and third factors, the State has shown "a reasonable fit" between the State Act and the State's "consumer protection interests," including that the State Act "directly advances those interests and is narrowly tailored."  *Mainstream Mktg. Servs.,* 358 F.3d at 1238.

The State Act's restriction of commercial speech regarding the designation of arts and crafts as "American Indian" in origin is, for First Amendment purposes, "a proportional response."  *Id.* (citation omitted).  The use of a reasonable definition of "American Indian" as adopted in the State Act, rather than another reasonable definition proposed by Plaintiff, does not make this any less true.  *See Fla. Bar*, 515 U.S. at 632 (noting that case law requires only "a 'fit' between the legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served" (internal quotation marks omitted)).  Accordingly, Plaintiff's First Amendment challenge fails.

*F.  Supremacy Clause / Federal Preemption*

Finally, Plaintiff has asserted that enforcement of the State Act "unconstitutionally frustrates the purpose" of the Indian Acts and Crafts Act of 1990 ("IACA"), 25 U.S.C. §§ 305-305f, "in violation of the Supremacy Clause."  Compl. ¶ 74.  The Supremacy Clause of the United States Constitution provides in relevant part that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the . . . Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Courts have long recognized that the Supremacy Clause

26

"invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough*

*Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden*,

22 U.S. (9 Wheat.) 1, 211 (1824)).

In 1990, Congress passed the IACA "to protect Indian artists from unfair

competition from counterfeits."[21]  Def.'s Mot. Ex. 2 (H. Comm. on Int. & Insular Affairs

Rep. on H.R. 2006, H.R. Rep. No. 101-400(I) at 3 (Feb. 6, 1990)) (Doc. No. 35-2, at 1)

[hereinafter "H.R. Rep. No. 101-400(I)"].  The Indian Arts and Crafts Board,[22] tasked with

implementing the IACA, was charged with "the duty . . . to promote the economic welfare

of the Indian tribes and Indian individuals through the development of Indian arts and crafts

and the expansion of the market for the products of Indian art and craftsmanship."  25

U.S.C. § 305a.

The IACA penalizes any "person who, directly or indirectly, offers or displays for

sale or sells a good . . . in a manner that falsely suggests it is Indian produced, an Indian

---

[21] *See Native Am. Arts, Inc. v. Contract Specialties, Inc.*, 754 F. Supp. 2d 386, 388 (D.R.I. 2010) ("The IACA is a truth-in-advertising statute aimed at ensuring that products marketed and sold as 'Indian' are actually Indian."); *id.* (explaining that IACA was enacted "in response to concerns that a significant portion of the national market for 'Indian' products was made up of counterfeit products, and that existing state and federal laws (including a 1935 version of the Act) were ineffective in curbing the flood").

[22] The IACA was designed "to expand the powers of the Indian Arts and Crafts Board" ("Board").  H.R. Rep. No. 101-400(I) at 1 (Doc. No. 35-2, at 1).  The Board, which was established in 1935, was "responsible . . . for promoting the development of Indian arts and crafts" and "for improving the economic status of Native Americans; establishing and expanding the marketing opportunities for Indian people; and assisting Indian tribes to develop a framework to support the preservation and evolution of tribal cultural activities." *Id.* at 4 (Doc. No. 35-2, at 2).

product, or the product of a particular Indian or Indian tribe or Indian arts and crafts organization." *Id*. § 305e(b). IACA violators are subject to imposition of equitable and legal relief, as well as to criminal prosecution. *Id*. § 305e(b), (c); *id*. § 305d.

The IACA defines the term "Indian" as "an individual that . . . is a member of an Indian tribe" or "is certified as an Indian artisan by an Indian tribe." *Id*. § 305e(a)(1)(A), (B). The IACA generally ascribes to the term "Indian tribe" the definition set forth in 25 U.S.C. § 5304, namely: "any Indian tribe, band, nation, or other organized group or community, . . . which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." *Id*. § 305e(a)(3)(A); *id*. § 5304(e). But "for purposes of" § 305e—the IACA's above-quoted prohibition on falsely offering, displaying for sale, or selling goods or products of Indian origin—the IACA expressly includes in its definition of "Indian tribe" any

> Indian group that has been formally recognized as an Indian tribe by—
>
> (i) a State legislature;
>
> (ii) a State commission; or
>
> (iii) another similar organization vested with State legislative tribal recognition authority.[23]

---

[23] At least two states define "American Indian tribe" to include state-recognized tribes. *See* N.M. Stat. Ann. § 30-33-4(A)(1)-(2) ("'Indian tribe' means: (1) any tribe, band, nation, Alaska native village or other organized group or community that is eligible for the special programs and services provided by the United States government to Indians because of their status as Indians; or (2) any tribe that has been formally recognized as an Indian tribe by a state legislature"); Tex. Bus. & Com. Code Ann. § 17.851(1) ("'American Indian' or 'Indian' means an individual who is an enrolled member of a federally or state recognized American Indian tribe, band, nation, rancheria, or pueblo or who is an Alaska Native and

*Id.* § 305e(a)(3)(B)(i)-(iii).

"[F]ederal law may preempt or supersede state law either impliedly or by express intention." *Schneberger v. Air Evac EMS, Inc.*, 749 F. App'x 670, 676 (10th Cir. 2018); *see Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (noting that preemption "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose" (internal quotation marks omitted)); *Boyz Sanitation Serv., Inc. v. City of Rawlins*, 889 F.3d 1189, 1198 (10th Cir. 2018); *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010). The IACA does not expressly preempt state regulation of the kind at issue in the State Act.[24]  Thus, to prevail on her preemption claim, Plaintiff must show that the State Act is impliedly preempted by the IACA.  "[S]tate laws may be impliedly preempted either as a result of conflict or field preemption." *Chamber of Commerce*, 594 F.3d at 765.[25]

---

a member of an Alaska Native village or regional or village corporation as defined in or established under the Alaska Native Claims Settlement Act (43 U.S.C. Sec. 1601 et seq.)").

[24] *See* Def.'s Mot. Ex. 2 (H.R. Comm. on the Jud. on H.R. 2006, H.R. Rep. No. 400(II), 101st Cong., 2d Sess. at 8 (Sept. 21, 1990)) (Doc. No. 35-2, at 15) ("The bill previously contained a preemption clause.  Upon further consideration, however, it was concluded that states should be permitted to protect their own Indian arts and crafts, provided that they do not interfere with federal law . . . .").

[25] *See Gade*, 505 U.S. at 115 (Souter, J., dissenting) (federal preemption of state law recognized "in three variants: express pre-emption, field pre-emption, and conflict pre-emption").

1.  Field Preemption

"States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citing *Gade*, 505 U.S. at 115 (Souter, J., dissenting)).  "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"  *Id.* (omissions in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  But in navigating any issue of field preemption, "[t]he purpose of Congress is the ultimate touchstone."  *Retail Clerks Int'l Ass'n v. Schermerhorn*, 375 U.S. 96, 103 (1963); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

Plaintiff has not shown that the IACA "reflects a congressional decision to foreclose any state regulation" in connection with the marketing and sale of American Indian arts and crafts.  *Arizona*, 567 U.S. at 401.  Rather, the summary judgment record reflects Congress expressly contemplated continuing state regulation:

> H.R. 2006, as reported by the House Interior Committee, would have preempted States from enacting and enforcing their own laws with respect to imitation Indian arts and crafts.  At the time, it was felt that a uniform, national standard was the best approach.  Upon further reflection, . . . it became apparent that many States are ahead of the Congress with regard to enacting legislation designed to protect genuine Indian arts and crafts.  Accordingly, the section in the bill that would have preempted State legislative actions in this field has been deleted.  I am pleased that many State legislatures . . . have felt it important to help protect local Indian commerce from fraudulent competition coming from foreign and domestic sources.  I am optimistic that the provisions of H.R. 2006, along with complementary

30

State legislative initiatives, will go a long way toward providing the proper level of economic protection to the . . . handiwork of our American Indian artisans.

Def.'s Mot. Ex. 6 (Hearings on H.R. 2006, 101st Cong., 2d Sess. (1990) (statement of Rep. Rhodes) (Doc. No. 35-6) at 6-7. Accordingly, the Court finds that Congress did not intend to occupy the field of consumer protection in the marketing and sale of American Indian-made arts and crafts.

### 2. Conflict Preemption

The second variant of implied preemption—"conflict" or "direct" preemption— occurs when a state law conflicts with a federal law. *See Hillsborough Cty*., 471 U.S. at 713 ("Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law."); *Chamber of Commerce*, 594 F.3d at 765. Instances of conflict preemption include "when 'compliance with both federal and state regulations is a physical impossibility'" and when the challenged "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hillsborough Cty.,* 471 U.S. at 713 (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963)); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Again, the touchstone in navigating any issue of conflict preemption—including whether the State Act "stands as an obstacle" to, or impedes the accomplishment of, the IACA's objectives—is the intent of Congress in

enacting the federal law.[26]  *See Medtronic, Inc.,* 518 U.S. at 485 ("Congress' intent primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it.").  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Plaintiff has argued that the State Act "undermines" the IACA's "purpose . . . to protect a broad array of American Indians from fraudulent misrepresentations in the national American Indian art market"—"not just those who are members of federal recognized tribes."  Pl.'s Mem. at 21, 23.  Plaintiff has alleged that enforcement of the State Act interferes with enforcement of the IACA, as shown by the following:

- "The [IACA's] purpose is to develop a robust market for American Indian art and crafts.  It broadly defines American Indians as three categories of artists: members of a federally recognized tribe; artisans certified by an American Indian tribe; and members of state-recognized tribes."  Compl. ¶ 70.

- "Oklahoma's . . . Act frustrates that purpose by limiting the definition of American Indians to only one of those three categories of artists: members of federally recognized tribes."  *Id.* ¶ 71.

- "As a member of a state-recognized tribe, but not of a federally recognized tribe, [Plaintiff] may not fully participate in the American Indian art and crafts market contemplated under the [IACA] because she cannot call herself an American Indian when marketing and describing her art in Oklahoma."  *Id.* ¶ 72.

- Plaintiff therefore "cannot practically carry on her business in Oklahoma even though she complies with the [IACA].  [She] will continue to be prohibited from conducting her business in Oklahoma due to Oklahoma's conflicting law,

---

[26] The Supreme Court has observed that "[i]t will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so.  The exercise of federal supremacy is not lightly to be presumed."  *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 413 (1973) (internal quotation marks omitted).

resulting in substantial and irreparable harm unless the [State] Act is declared unlawful and enjoined by this Court." *Id*. ¶ 73.

The Court agrees.

As its statutory language and legislative history reflect, the IACA's drafters "struggled with" with the "difficult issue" of defining the term "Indian." Def.'s Mot. Ex. 6 (Hrg. H.R. 2006, 101st Cong., 2d Sess.) (statement of Rep. Kyl) (Doc. No. 35-6) at 8. The definitions of the words "Indian tribe" and "Indian" in the initial version of the IACA were "relatively narrow" and included only federally recognized tribes and their members. Pl.'s Index of Evid. Ex. 10 (To Expand the Powers of the Indian Arts and Crafts Board: Hearing on H.R. 2006 Before the H. Comm. on Int. & Insular Affairs, 101st Cong., 1st Sess. 1, 67 (1989) (statement of Rep. Kyl) (Doc. No. 34-10) at 18 (hereinafter, "Hrg. H.R. 2006, 101st Cong., 1st Sess."); *id*. (Hrg. H.R. 2006, 101st Cong., 1st Sess. at 11) (Doc. No. 34-10) at 7.[27] The drafters noted, however, their belief that these definitions would "have to be broadened," *id*. (Hrg. H.R. 2006, 101st Cong., lst Sess. at 67) (statement of Rep. Kyl) (Doc. No. 34-10) at 18, and that "how [they] . . . define[d] the term[s] can and will affect the livelihoods of many artisans," Def.'s Mot. Ex. 6 (Hrg. H.R. 2006, 101st Cong., 2d Sess.) (statement of Rep. Kyl) (Doc. No. 35-6) at 8. To this end, the final version of the IACA states that, insofar as the Act's regulation of the marketing and sale of Indian goods,

---

[27] *See* Pl.'s Index of Evid. Ex. 10 (H.R. 2006, 101st Cong., 1st Sess. at 11) (Doc. No. 34-10) at 7 ("'the term "Indian" means any individual who is a member of an Indian tribe'"); *id*. ("'the term "Indian tribe" means any Indian tribe, band, nation, Alaska Native village, or other organized group or community which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians'").

the Act's protection extends to works created by "a member of a federally recognized tribe," a member of "a tribe recognized by a State legislature or by a State commission or similar organization legislatively vested with State trial recognition authority," or persons whom "tribes . . . certify . . . as Indian artisans." *Id.*;[28] *accord* 25 U.S.C. § 305e(a)(1), 305e(a)(3)(B).

The Court finds that by excluding from the State Act's definition of "American Indian" members (or certified artisans) of tribes that are recognized by a state but not the federal government, the State Act constitutes "an obstacle to the accomplishment and execution of the full purposes and objectives of" the IACA. *Davidowitz*, 312 U.S. at 67. The purpose of Congress in enacting the IACA, as reflected in the express language of the Act and its statutory scheme, was "to promote the economic welfare of the Indian tribes and Indian individuals through the development of Indian arts and crafts and the expansion of the market for the products of Indian art and craftsmanship." 25 U.S.C. § 305a. This purpose is confirmed by the IACA's legislative history, which more broadly reflects that the Act was designed to (1) protect "the economic and cultural integrity of authentic Indian arts and crafts," Def.'s Mot. Ex. 3 (S. Rep. No. 452, 106th Cong., 2d Sess. 1 (2000)) (Doc.

---

[28] *See also* Def.'s Mot. Ex. 2 (H.R. Comm. on the Jud. on H.R. 2006, H.R. Rep. No. 400(II), 101st Cong., 2d Sess. at 7 (Sept. 21, 1990)) (Doc. No. 35-2, at 13-14) ("Several members of Congress, who have state but not federally recognized Indian Tribes in their districts, objected to the definition of Indian Tribe, on the grounds that it did not include state recognized tribes. Because such tribes were not 'Indian tribes' within the meaning of the bill, artisans in those tribes who represented their goods as Indian made would arguably be in violation of the Act. To avoid this problem, the definition of Indian tribe was revised to include state recognized tribes.").

No. 35-3, at 1); (2) protect "Indian artists from unfair and fraudulent competition from counterfeit arts and crafts products," *id*. Ex. 6 (Hearings on H.R. 2006, 101st Cong., 2d Sess. (1990)) (statement of Rep. Faleomavaega) (Doc. No. 35-6, at 5); and (3) "discourage . . . fraudulent sales to unsuspecting customers" by "individuals who are knowingly misrepresenting themselves in the market," *id*.

The State Act, by interjecting a narrower definition for "American Indian" than is set forth in the IACA, prohibits in Oklahoma certain conduct—specifically the marketing and sale of works by some artists—that otherwise is protected by the IACA. In doing so, the State Act diminishes "the market for the products of Indian art and craftsmanship," 25 U.S.C. § 305a, that the IACA states it was designed to promote and develop. Thus, the fault in the State Act is not that the definitions it draws are unreasonable, and not that those definitions are unconstitutional in and of themselves—defining who should and should not be recognized as a member of a tribe is a difficult matter even for tribal governments—but that the definitions used place the State Act in conflict with Congress's intentional adoption of federal legislation to give protection to, and promote a market for the works of, a broader range of tribal artists. Because Oklahoma's American Indian Arts and Crafts Sales Act, as amended, "'stands as an obstacle to the accomplishment and execution of the full purposes and [congressional] objectives'" of the IACA, *Crosby*, 530 U.S. at 373 (quoting *Davidowitz*, 312 U.S. at 67), the State Act is preempted under the Supremacy Clause.

CONCLUSION

Although the Court rejects Plaintiff's challenges under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as well as those under the dormant

Commerce Clause and the First Amendment, the Court finds for the foregoing reasons that Plaintiff has shown that Oklahoma's American Indian Arts and Crafts Sales Act of 1974, as amended, Okla. Stat. tit. 78, §§ 71-75, violates the United States Constitution's Supremacy Clause and is therefore unconstitutional, both facially and as applied to her.[29] No genuine factual issue necessitates a trial on the merits of this case. Plaintiff is therefore entitled to judgment as a matter of law.

Accordingly, the Court

(1) GRANTS IN PART and DENIES IN PART Plaintiff's Motion for Summary Judgment (Doc. No. 32);

(2) GRANTS IN PART and DENIES IN PART the State's Motion for Summary Judgment (Doc. No. 35); and

(3) DIRECTS the parties to confer and submit within 21 days a proposed judgment for the Court's approval and signature that summarizes the Court's findings and conclusions and grants Plaintiff the equitable declaratory and injunctive relief she has requested in her complaint.

IT IS SO ORDERED this 28th day of March, 2019.

CHARLES B. GOODWIN
United States District Judge

---

[29] *See supra* note 2.